## IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON

TODD FREDERICK BROOKS,　　　　　)

　　　　　Plaintiff/Appellant,　　　　)

v.　　　　　　　　　　　　　　　　　)

LINDA FAYE CARTER,　　　　　　　)

　　　　　Defendant/Appellee.　　　　)

FOR PUBLICATION

**Filed: May 24, 1999**

SHELBY COUNTY

Hon. Karen R. Williams
Judge

No. 02S01-9903-CV-00023

FILED

May 24, 1999

**Cecil Crowson, Jr.**

**Appellate Court Clerk**

FOR APPELLANT
The Hardison Law Firm
Robert L. J. Spence, Jr.
Memphis, TN

FOR APPELLEE
Rita L. Stotts
Viola E. Johnson
Memphis, TN

# OPINION

RULE 10 APPLICATION FOR EXTRAORDINARY APPEAL GRANTED,
COURT OF APPEALS REVERSED.
RULE 11 APPLICATION FOR PERMISSION TO APPEAL DENIED,
COURT OF APPEALS AFFIRMED.　　　　　　　　　　　DROWOTA, J.

In this child custody case, we granted the application for extraordinary appeal to consider whether the Court of Appeals erred by ordering that mandate issue before the time period set forth by Tenn. R. App. P. 42 had expired.

As part of a final divorce decree, the trial court awarded primary custody of the parties' three minor children to the father. On February 2, 1999, the Court of Appeals reversed this aspect of the trial court's order and remanded the case to the trial court to enter an order designating the mother as the primary custodian. The trial court entered an order on February 4, 1999, designating the mother as primary custodian, which order was to take effect immediately. On February 9, 1999, however, the trial court vacated the February 4 order and stated that no actions would be taken until mandate had been issued from the Court of Appeals or the Supreme Court. Contending that the trial court erred in vacating the February 4 order, the mother filed a Tenn. R. App. P. 10 application for extraordinary appeal before the Court of Appeals. The Court of Appeals granted this application on February 24, 1999, ordered the Clerk of the Appellate Court to issue mandate, and thereby directed the trial court to enter an order changing custody to the mother. Accordingly, the trial court entered an order on February 26, 1999, awarding custody of the children to the mother, and the father proceeded to file an application for extraordinary appeal before this Court on March 11, 1999. On March 29, 1999, we granted the father's application, directed the parties to file briefs within ten days, and ordered that oral argument would not take place. Tenn. R. App. P. 10(d). Thereafter, on April 2, 1999, the father also filed a Tenn. R. App. P. 11 application for permission to appeal in this Court, asking this Court to review the merits of the Court of Appeals' February 2,

1999 opinion. We have chosen to resolve the Tenn. R. App. P. 10 and Tenn. R. App. P. 11 applications in this single opinion.

We find that the Court of Appeals erred in issuing mandate before sixty-four days had passed from the Court of Appeals' February 2, 1999 judgment or before a Tenn. R. App. P. 11 application for permission to appeal had been considered by this Court. Nevertheless, because we deny the father's Tenn. R. App. P. 11 application for permission to appeal, the mother shall retain primary custody of the children.

## PROCEDURAL HISTORY

This case began in June 1996 when Plaintiff/Appellant Todd Frederick Brooks ("the Father") filed a complaint against Defendant/Appellee Linda Faye Carter ("the Mother") in Shelby County Circuit Court, alleging abandonment and inappropriate marital conduct. The Mother counterclaimed for divorce on the grounds of inappropriate martial conduct and irreconcilable differences. Both parties sought custody of their three minor children: Ashleigh, born August 1989, Jared, born February 1992, and Dylan, born September 1995. In July 1996 the trial court appointed Rita Robinson, a Memphis attorney, to serve as guardian ad litem for the three children.

By virtue of a consent order entered in August 1996, both parties continued to live in the marital home pending further orders of the court. A hearing was held over nine separate days in September and October 1996, after which the trial court entered a temporary custody order. The trial court granted the parties joint custody pending the divorce proceedings. The Father was designated as the primary

-3-

custodial parent. The Father and the children were to continue to live in the marital home. The Mother was granted visitation on Monday through Thursday of each week, beginning at 3:15 p.m., when the two older children finished school, and ending by 8:30 p.m. The order also granted the Mother visitation every other weekend from 8:00 a.m. on Saturday until 10:00 a.m. on Sunday. On the other weekends, the Mother was granted visitation on Sunday from 10:00 a.m. to 9:00 p.m.

In February 1997, the trial court relieved the guardian ad litem of her duties and appointed a Court Appointed Special Advocate ("CASA") to represent the interests of the children. The trial court conducted a trial in July 1997. The Court of Appeals' February 2, 1999 opinion, written by Judge Farmer, cogently discusses the testimony presented during this trial:

> In the present case, the evidence revealed the following facts, most of which were undisputed. The Father worked as an obstetrician-gynecologist and was affiliated with Methodist Central Hospital in Memphis. The Father also served as a clinical instructor at the University of Tennessee-Memphis. The Father participated in a nineteen-physician call group. On weekdays, the Father generally left the house at 7:00 a.m. and did not return until about 6:00 or 6:30 p.m. The Father's job required him to be on call for his own patients from 7:00 a.m. to 5:00 p.m. during the work week. In addition, two or three times per month, the Father was required to be on call to treat the patients of the other physicians in his group. On these occasions, another adult besides the Father was required to stay with the children in the marital home because, at any moment, the Father could be called to the hospital to deliver a baby.

> In contrast, the Mother had a more flexible work schedule which enabled her to spend a greater portion of her time with the children. The Mother, who had an MBA degree from the University of Memphis, worked part-time in the personnel department at Federal Express. She worked three days per week, Tuesday, Wednesday, and Friday. The Mother was able to arrange her work schedule so that she could pick up the children from school every afternoon at 3:15 p.m. The Mother also transported the children to extracurricular activities in the

-4-

afternoon, such as piano, gymnastics, and martial arts lessons, and she provided the children with their evening meal. During the marriage, the parties hired a nanny to watch their youngest child during the work week. During most weeks, the Mother cared for the youngest child on Monday, and the nanny cared for him from Tuesday through Friday. The Mother also cared for the youngest child on Saturday while the Father spent time with the two older children.

At the temporary custody hearing and, later, at the final divorce trial, both parties claimed to be the children's primary caregiver. The Mother testified that she breast-fed all three children and stayed home with them during the first six months of their lives. According to the Mother, she also helped the children prepare for school in the morning and made sure that they were properly dressed and groomed. On the other hand, the Father testified that he awakened the children, fed them breakfast, helped them dress, and transported them to school each weekday morning. The Father also testified that, the majority of the time, he was the parent who bathed the children and put them to bed at night.

Despite the Father's claims to be the children's primary caregiver, the overwhelming weight of the testimony supported the conclusion that the Mother consistently fulfilled this role throughout the parties' marriage. In his own testimony, for example, the Father acknowledged that the Mother was the parent primarily responsible for ensuring that the children's health-care needs were met. As a general rule, the Mother transported the children to the pediatrician's office, used the children's insurance prescription card to get their prescriptions filled, administered the children's medications, and cared for the children when they became ill. Most of the time, the Mother was the parent who stayed home from work when the children were ill. The Mother also was the parent who took the children to the dentist's office for checkups every six months.

The parties' youngest child was born with a large birthmark on the side of his face, which was described by the parties and doctors as a giant pigmented nevus. The child had undergone several surgeries to correct this condition, and at least two more surgeries would be required in the future. The Mother's testimony was uncontradicted that she was the parent who largely was responsible for the child's care after each surgery. The Mother explained that this care required that a piece of silicone be placed on the child's face and secured by a protective cap. The Mother expressed concern over the child's care while he was in the Father's custody because, on several occasions when she picked up the child for scheduled visitation, either he was not wearing the protective cap or the nanny had not placed the silicone on his face correctly.

In addition to ensuring that the children's medical needs were met, the Mother also played a more active role than did the Father in ensuring that their educational needs were met. The Father acknowledged that the Mother had more contact with the children's teachers than he did, a fact which was confirmed by one of the children's teachers. The Mother served as a room mother at school and attended almost all of the children's school parties. According to the same teacher, the Mother inquired as to the child's progress on a regular basis, whereas the Father never had consulted the teacher on this matter. In fact, the teacher did not remember ever having spoken to the Father. The Father further acknowledged that the Mother set up a special room in the parties' home where she presented additional educational materials to the children and that the Mother had taught sign language to the parties' oldest child.

In addition to the foregoing responsibilities, the Father acknowledged that the Mother had assumed most of the responsibility for arranging and scheduling the children's extracurricular activities, as well as transporting them to these activities. The Mother enrolled the children in such activities as piano lessons, gymnastics, and martial arts lessons. The Mother's work schedule enabled her to transport the children to these various activities on Mondays, Wednesdays, and Thursdays after school.

Prior to entry of the temporary custody order, the Mother also assumed the responsibility of paying the nanny and giving her instructions concerning the daily care of the children. The Mother primarily was responsible for combing and braiding the parties' daughter's hair. The Mother maintained photo albums and diaries recording each child's development. She paid the household expenses from a joint account into which the Father deposited a portion of his earnings. After the Father filed this divorce action, but prior to the Mother vacating the marital home pursuant to the temporary custody order, the Mother slept in a bedroom downstairs near the children's bedrooms while the Father slept in a room upstairs.

After the trial court entered its temporary custody order, the already notable conflicts between the parties became increasingly hostile. Unfortunately, most of these incidents occurred when the parties were exchanging custody of the children at the marital home. The Father claimed that the conflicts were caused by the Mother because she often insisted on entering the marital home and/or refused to leave the property when asked to do so. These allegations appeared to have some merit because, in her testimony at the final divorce trial, the Mother insisted that her children's presence in the marital home somehow gave her the right to enter the home. The Father also believed that the Mother had attempted to interfere with his telephone contact with the children when they were visiting the Mother because

she often provided excuses for why the children could not speak to him.

Nevertheless, the Father acknowledged that his own conduct and motives were less than exemplary. When a conflict at the marital home occurred, the Father routinely called the police in order to induce the Mother to leave the property. The Father explained that he did not want the Mother in the marital home because she kept taking marital property out of the home. The Father acknowledged, however, that one of the items which the Mother allegedly "snuck and took" was a Mercedes Benz automobile that was titled in her name.

Moreover, although in the past the Mother primarily had been responsible for providing the children's medical care, the Father admitted scheduling the youngest child's most recent surgery on a date that was "best" for the Father without regard for the Mother's schedule. After the child's surgery, the Father refused to allow the Mother to care for the child either in the marital home or in her own home. The Father was so adamant in his refusal that he enlisted the aid of the police and hospital security to prevent the Mother from caring for the child or taking the child home with her. The Father was on call that night, so his refusal resulted in the child being cared for by the nanny instead of the Mother.

Finally, the Father admitted that he exacerbated some of the hostility between the parties by taking such actions as changing the locks on the marital home on the day before the Mother was required to move out, as well as placing a board imbedded with nails in the driveway so that the Mother's car would get a flat tire. The Father went so far as to wrap plastic around the board so that it would resemble a newspaper.[1]

---

[1]In a footnote, the Court of Appeals also mentioned the following:

In addition to his more recent conduct, the Father also admitted that, prior to the parties' separation, he engaged in conduct that created cause for concern. During one fight when the Mother was pregnant with the parties' youngest child, the Mother allegedly became so enraged that she threatened to "blow away" the Father. The Father admitted that, in response to the Mother's statement, he retrieved a gun from her closet, dropped it on a chair or sofa next to her, and challenged her to shoot him. Hearing their parents fighting, the children then walked into the room, observed the gun, and became upset. According to the Mother, this altercation occurred late one evening after the Father had been drinking.

In August 1994, the Father was seriously injured in a car accident. The Father admitted that he caused the accident by falling asleep at the wheel, and he indicated that he made a "big mistake" by drinking alcoholic beverages after staying up until 4:00 a.m. the two previous nights. Although the Father claimed that he now was more careful about his drinking, and that drinking was not an important part of his life, he acknowledged that he drank beer, wine, or whiskey as often as every other day.

The initial guardian ad litem, who testified at the hearing on temporary custody, testified during this trial that it was her opinion that the Father was more cooperative than the Mother in terms of arranging visitation with the children. On the other hand, the CASA guardian testified that the children appeared to be closer to their mother. She stated that, while the Father was providing appropriate physical shelter for the children, the children were not receiving sufficient emotional and intellectual attention while in the Father's custody.

After considering the testimony presented, the trial court entered a final divorce decree awarding the parties joint custody of their three children, designating the Father as the primary custodial parent, and awarding liberal visitation to the Mother.[2]

Both parties appealed this final divorce decree to the Court of Appeals. On February 2, 1999, the Court of Appeals entered an order in which it affirmed in part, reversed in part, modified in part, and remanded the case to the trial court. Finding that the evidence preponderated against the trial court's award of primary custody to the Father,[3] the Court of Appeals reversed this aspect of the trial court's order and remanded the case to the trial court "to enter an order granting the Mother primary

Describing himself as a "stress smoker," the Father further acknowledged that he sometimes smoked cigarettes and drank alcoholic beverages while he was alone in his bedroom at night.

[2]The initial visitation schedule pursuant to the temporary custody order was modified, and the Mother argued that the trial court's final divorce decree reduced her visitation privileges.

[3]The Court of Appeals noted in particular that the Mother was the children's primary caregiver and that her work schedule was more accommodating to the needs of the children.

custody of the children, awarding liberal visitation to the Father, recalculating the Father's child support obligation pursuant to the Child Support Guidelines, and setting forth the parties' respective duties and responsibilities in this joint custody arrangement."

Relying on this decision and a motion filed by the Mother, the trial court entered an order on February 4, 1999, designating the Mother as primary custodian of the children effective immediately. Responding to an objection voiced by the Father, the trial court entered an order on February 9, 1999, stating that "pursuant to the Rules of Appellate Procedure, the Order that this Court entered on February 4, 1999 changing child custody should be vacated and that the issues set forth in the opinions of the Court of Appeals for remand should be held in abeyance until the mandate from the Court of Appeals or Supreme Court is received by the Clerk of the Circuit Court." Thereafter, the Mother filed an application for extraordinary relief before the Court of Appeals in accordance with Tenn. R. App. P. 10.[4]

In an order entered February 24, 1999, the Court of Appeals, in an order signed by one judge, granted the Mother's application and found that the trial court

---

[4]Rule 10 of the Tennessee Rules of Appellate Procedure provides as follows:

**(a) Original Application for Extraordinary Appeal; Grounds.** An extraordinary appeal may be sought on application and in the discretion of the appellate court alone of interlocutory orders of a lower court from which an appeal lies to the Supreme Court, Court of Appeals or Court of Criminal Appeals: (1) if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review, or (2) if necessary for complete determination of the action on appeal as otherwise provided in these rules. The appellate court may issue whatever order is necessary to implement review under this rule.

erred in vacating its February 4, 1999 order.[5] The Court of Appeals relied on Tenn. R. Civ. P. 62.01, which provides, in part, as follows:

> In injunction and receivership actions, and in actions that remove a public officer as otherwise provided by law or that award, change or otherwise affect the custody of a minor child, an interlocutory or final judgment shall not be stayed after entry unless otherwise ordered by the court and upon such terms as to bond or otherwise as it deems proper to secure the other party.

Therefore, the Court of Appeals directed the Clerk of the Appellate Courts to issue mandate. Accordingly, mandate was issued on February 24, 1999, ordering the trial court to immediately comply with the February 2, 1999 judgment of the Court of Appeals. As a result, the trial court entered an order on February 26, 1999, designating the Mother as primary custodian.

On March 11, 1999, the Father filed an application for extraordinary appeal before this Court pursuant to Tenn. R. App. P. 10. In his application, the Father asserted that the Court of Appeals erred by issuing its February 24, 1999 order without providing him with an opportunity to file a response to the Mother's application. The Father requested that this Court vacate the February 24, 1999 order rendered by the Court of Appeals. We granted the Father's application for extraordinary review on March 29, 1999, directed that briefs be filed within ten days, and disallowed oral argument. Thereafter, on April 8, 1999, the Father filed a Tenn. R. App. P. 11 application for permission to appeal before this Court, seeking review

---

[5]Although the parties have not raised the issue, we believe that applications filed pursuant to Rules 9 and 10 of the Tennessee Rules of Appellate Procedure should be granted by a majority of the members of a three judge panel. Although the Rules do not explicitly specify the requisite number of votes required for such applications to be granted, Rule 22(d) specifies that an appeal may not be "disposed of" by a single judge.

of the merits of the Court of Appeals' February 2, 1999 decision, which named the Mother as primary custodian.

## DISCUSSION

As stated earlier, in the interest of judicial efficiency, we find that it is prudent to address the Tenn. R. App. P. 10 appeal as well as the Father's Tenn. R. App. P. 11 application in this opinion. Rule 42 of the Tennessee Rules of Appellate Procedure provides, in pertinent part, as follows:

> (a) Definition; Issuance; Stay on Petition for Rehearing. Copies, certified by the clerk of the appellate court, of the judgment, statement of costs, any order as to costs or instructions as to interest, and a copy of the opinion of the appellate court shall constitute the mandate.

> \*     \*     \*

> The clerk of the Court of Appeals and Court of Criminal Appeals shall transmit to the clerk of the trial court the mandate of the Court of Appeals or Court of Criminal Appeals, with notice to the parties, 64 days after entry of judgment unless the court orders otherwise. The timely filing of a petition for rehearing will stay the mandate until disposition of the petition unless the court orders otherwise. The mandate shall issue 64 days after denial of the petition for rehearing or, if the petition for rehearing is granted, 64 days after entry of judgment on rehearing.

> \*     \*     \*

> (b) Stay When Review by Supreme Court Is Sought. Unless otherwise ordered by the Supreme Court, Court of Appeals, Court of Criminal Appeals, or a judge thereof, the timely filing of an application for permission to appeal in the Supreme Court shall stay the issuance of the mandate of the Court of Appeals or Court of Criminal Appeals, which stay is effective until final disposition by the Supreme Court. Upon the filing of an order of the Supreme Court denying the application for permission to appeal, the mandate shall issue immediately.

The clear intent of this sixty-four day period is to allow the parties sixty days to file an application for permission to appeal to the Tennessee Supreme Court, see Tenn. R.

App. P. 11, as well as to provide a four-day "cushion" which enables the filing of the application by registered mail. If no application for permission to appeal is filed within this time frame, mandate shall issue. Tenn. R. App. P. 42(a). If, however, an application for permission to appeal is timely filed, then the issuance of mandate is stayed pending final disposition by the Supreme Court. Tenn. R. App. P. 42(b).

In the present case, the Court of Appeals directed that mandate shall issue before the sixty-four day period had elapsed. The Court of Appeals apparently interpreted Rule 62.01 of the Tennessee Rules of Civil Procedure as a device designed to circumvent the application of Tenn. R. App. P. 42 for certain cases. As mentioned above, Tenn. R. Civ. P. 62.01 provides, in pertinent part, as follows:

> [I]n actions that . . . award, change or otherwise affect the custody of a minor child, an interlocutory or final judgment shall not be stayed after entry unless otherwise ordered by the court and upon such terms as to bond or otherwise as it deems proper to secure the other party.

We find, however, that this Rule applies to the trial courts of this state and was not intended to supersede the sixty-four day period set forth in Tenn. R. App. P. 42. First of all, the Tennessee Rules of Civil Procedure govern procedure in Tennessee trial courts and do not control appellate court procedure. See Tenn. R. Civ. P. 1. Rule 62.01 of the Tennessee Rules of Civil Procedure applies in situations in which a *trial court* has rendered a custody decision. Thus, in situations in which a trial court has "award[ed], change[d] or otherwise affect[ed] the custody of a minor child," the trial court's custody decision will not ordinarily be stayed pending appeal. Tenn. R. Civ. P. 62.01. This rule, however, is inapplicable in cases in which an appellate

-12-

court has "award[ed], change[d] or otherwise affect[ed] the custody of a minor child." Id.

Furthermore, we believe that a contrary interpretation may detrimentally affect the welfare of a minor child. For instance, if a trial court awards custody of a minor child to her mother, and later that the Court of Appeals reverses the trial court's decision and awards custody to the father and orders the immediate issuance of mandate, and the Supreme Court grants a Tenn. R. App. P. 11 application filed by the mother and reverses the Court of Appeals' decision, custody of the child will have changed from the mother, to the father, and ultimately back to the mother. Such a chain of events would likely be harmful to the welfare of the child.

While not expressly prohibited by Tenn. R. App. P. 42, we find that in a child custody case, such as this, the Court of Appeals' February 24, 1999 order directing that mandate be issued was ill-advised.[6] Because the Father timely filed a Tenn. R. App. P. 11 application for permission to appeal, the issuance of mandate should have been stayed pending final disposition by this Court. Tenn. R. App. P. 42(b). Nevertheless, after reviewing the Father's Tenn. R. App. P. 11 application for permission to appeal, the record, and the Court of Appeals' well-crafted February 2, 1999 opinion, we believe that the Father has failed to demonstrate requisite criteria

---

[6]Rule 42(a) of the Tennessee Rules of Appellate Procedure provides that mandate shall issue after the sixty-four day period "unless the court orders otherwise." (Emphasis added). We acknowledge that the rule is designed to enable the Court of Appeals to direct the immediate issuance of mandate if the context warrants such an order. For instance, if a child custody case involves a situation in which the Court of Appeals reasonably believed that a child would be in danger in the event that the parent awarded custody by the trial court retained custody while the issuance of mandate was stayed pursuant to Tenn. R. App. P. 42, the Court of Appeals may justifiably direct that mandate be immediately issued. In the present case, however, no risk of danger was alleged and the Court of Appeals did not even provide the Father with an opportunity to respond to the Mother's Tenn. R. App. P. 10 application.

for review of the merits of this case by this Court and, thus, we decline to exercise review.  <u>See</u> Tenn. R. App. P. 11(a).

## CONCLUSION

In sum, we reverse the February 24, 1999 action of the Court of Appeals directing that mandate shall issue.  However, the Father's Tenn. R. App. P. 11 application for permission to appeal is hereby denied.  Mandate shall immediately be issued in conformity with Tenn. R. App. P. 42(b).  The result is that the Mother shall remain primary custodian of the parties' children.

Costs on appeal are taxed equally to both parties.

_____

Frank F. Drowota, III,
Justice

**CONCUR:**

Anderson, C.J.
Birch, Holder, Barker, J.J.

-14-