IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2022 Session

**L.A.S. v. C.W.H.**

**Appeal from the Juvenile Court for Hamilton County**
**No. 293-521, 293-522     Robert D. Philyaw, Judge**

_____

**No. E2021-00504-COA-R3-JV**
_____

This is a custody dispute over two minor children, P.H. and V.H. (together, "the Children"). The Children's mother, L.A.S. ("Mother"), lives in Nevada, while the Children live primarily in Tennessee with their father, C.W.H. ("Father"), and his wife ("Stepmother"). Father is the primary residential parent, and Mother sees the Children over the summers and during their breaks from school. On June 12, 2020, Mother filed a petition to modify the permanent parenting plan and for contempt in the Hamilton County Juvenile Court (the "juvenile court"). Mother asked to be named primary residential parent. Following a three-day bench trial, the juvenile court dismissed Mother's petition. The juvenile court determined that no material change in circumstances warranting a change in custody had occurred. Mother timely appealed to this Court. Having thoroughly reviewed the record, we discern no error and affirm the juvenile court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jillyn M. O'Shaughnessy, Chattanooga, Tennessee, and Donald Capparella and Kimberly Macdonald, Nashville, Tennessee for the appellant, L.A.S.

Randall D. Larramore, Chattanooga, Tennessee, for the appellee, C.W.H.

**OPINION**

**BACKGROUND**

Mother and Father, who never married, have been disputing custody of the Children since 2013. The parties have been before this Court multiple times, and the case proceeded

to our Supreme Court in 2017. A brief history of the case is thus helpful:

Mother and Father began a dating relationship in 2008. During that time, Father lived in Pennsylvania and Mother lived in Ohio. Mother became pregnant with the parties' older child, P.H., and gave birth to [P.H. in January of 2009]. Soon thereafter, Mother moved to Chattanooga, Tennessee, and resided with her mother. Father relocated two to three months later, in August 2009, and lived with Mother. Father cared for P.H. as a stay-at-home father. The parties' younger child, [V.H.], was born [in June of 2010].

\* \* \*

In November 2010, the relationship deteriorated and the parties separated. Mother planned to relocate to Ohio in pursuit of a master's degree. To facilitate the move, the parties entered into an agreed parenting plan in May 2011 to accommodate the distance and address parenting time. The plan designated Mother as the primary residential parent and allotted Father 144 days of parenting time per year.

\* \* \*

During a February 2013 conference, Mother indicated that she was working as an independent contractor in social work. She said she was seeking employment in different states and that Nevada was one such state. Father had previously noted that in January 2013 when the children arrived in Tennessee for a visit, the children's luggage bore labels from Charlotte and Phoenix, but he was unaware that the children had visited the western United States. The parties agreed upon a modified plan that addressed Father's concerns but left the residential parenting designation and the parenting time between the parties as it was.

\* \* \*

Shortly thereafter, Mother's sister contacted Father and informed him that Mother actually resided in Nevada with the minor children and that she was employed as a prostitute. Father had believed that Mother resided in Ohio and worked as an independent contractor. Father researched the internet and confirmed these assertions when he found sexually explicit photographs and videos of Mother advertising her services as a prostitute employed by the Moonlight Bunny Ranch in Nevada. He filed a motion for an emergency temporary custody order and temporary restraining order on March 12, 2013. The magistrate found that a material change in circumstances had occurred and that it was in the children's best interest for Father to be designated as

the primary residential parent.

\* \* \*

Mother appealed the juvenile court's ruling to the Court of Appeals. Without addressing the juvenile court's finding of a material change in circumstances, the appellate court vacated the juvenile court's order and remanded the case for the juvenile court to conduct a best interest analysis. *C.W.H. v. L.A.S.*, No. E2015-01498-COA-R3-JV, 2016 WL 6426731, at \*3 (Tenn. Ct. App. Oct. 31, 2016), *perm. app. granted* (Tenn. Apr. 12, 2017) (citation omitted).

\* \* \*

On remand, the parties had the opportunity to present additional evidence but declined to do so. By order dated July 10, 2015, the juvenile court reaffirmed its prior findings of material change in circumstance and incorporated the required best interest analysis.

\* \* \*

Mother appealed the juvenile court's ruling. In reversing the juvenile court's determination, the Court of Appeals concluded that neither the juvenile court's finding of Mother's deceit nor her former employment as a prostitute constituted a material change in circumstance without a finding of how the circumstances affected the children. *C.W.H.*, 2016 WL 6426731, at \*\*5, 9. The Court of Appeals further concluded that the evidence did not preponderate against the juvenile court's factual findings of Mother's hostility toward Father and Stepmother or its finding that said hostility constituted a material change in circumstances because it had affected the children. *Id.* at \*11. However, the Court of Appeals reasoned that the juvenile court abused its discretion in determining that it was in the best interest of the children for Father to be designated as the primary residential parent because the juvenile court relied heavily on Mother's employment as a prostitute and failed to consider in its analysis Father's child support arrearage and his ingesting cocaine in his home while the children were present. *Id.* at \*16. Father's appeal to this Court followed. Upon our consideration, we hold that the Court of Appeals improperly applied the well-settled standard of review as set forth in *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013); that the Court of Appeals applied the incorrect version of the statute governing the requisite best interest analysis, *see* Tenn. Code Ann. § 36-6-106; and that the appellate court erred in mandating an immediate change of custody without allowing Father an

opportunity to seek review by this Court, *see Brooks v. Carter*, 993 S.W.2d 603, 610-11 & n.6 (Tenn. 1999) (citing Tenn. R. App. P. 42(b)).

*C.W.H. v. L.A.S.*, 538 S.W.3d 488, 491–95 (Tenn. 2017).

After our Supreme Court reversed this Court's decision on December 19, 2017, the case was remanded to the juvenile court, and Mother was ordered to return the Children to Father and Stepmother. Mother instead filed emergency proceedings in Nevada asking the Nevada court to exercise jurisdiction over the case and keep the Children in Mother's custody. While the details of the Nevada proceedings are unclear, Mother's efforts were ultimately unsuccessful, and the Children returned to Tennessee in January of 2018 to reside primarily with Father and Stepmother. Soon after this change, Father and Stepmother bought a new home in Chattanooga, and the Children began new schools in the fall of 2018. Father and Stepmother also have another child together, C.H., who resides full time with Father and Stepmother. C.H. is younger, but still close in age, to the Children.

Since the Supreme Court ruling, the Children have spent most of their time in Tennessee, with Mother's parenting time exercised over the summers and during school holidays. Mother's extended family still resides around Chattanooga, and Mother comes into town several times a year to visit and exercise parenting time with the Children. In the interim, Mother has moved in with a registered domestic partner,[1] G.T., with whom she now has an infant daughter. The infant was born in May of 2020. G.T. also has minor children with his ex-wife; these children split their time with G.T. and Mother, and G.T.'s ex-wife.

Mother is now employed as a social worker and works primarily from home. Her work schedule tends to be Monday through Friday, 6:00 a.m. to 3:00 p.m. She has a lot of flexibility over her schedule. Father is a restaurant manager who works approximately fifty hours per week. Father's schedule tends to be 7:00 a.m. to 5:00 p.m., with one day off during the week and Saturdays off. As he is the manager and makes the schedule, Father also has some flexibility with his time. Stepmother stopped working in early 2019 to stay home with the Children and C.H. She testified that the schedule became too chaotic with all three children needing to be dropped off and picked up from school and then taken to various sports and extra-curricular activities. When Father is off work during the week, he takes the Children to school and picks them up. Otherwise, this responsibility lies with Stepmother.

In keeping with their history, the parties continued to have great difficulty co-parenting. *See C.W.H.*, 538 S.W.3d at 492–93 (expounding on the difficult relationship between the parties, including Mother's refusal to allow the Children to attend Father's and

---

[1] Mother and G.T. testified that this arrangement is allowed under Nevada law.

Stepmother's wedding). The relationship between Mother and Stepmother, who apparently worked together many years ago, is particularly contentious. It is undisputed that Mother and Stepmother do not speak to one another, Mother going so far as to block Stepmother's phone number. Stepmother testified at trial that she would like to communicate with Mother and attend counseling to improve their relationship; Mother, however, was not amenable to this.

On June 12, 2020, Mother filed a petition for contempt and modification of the permanent parenting plan (the "PPP") in the juvenile court. Mother sought to be named primary residential parent, alleging that a material change in circumstances had occurred based on Father's "lack of care for" and "lack of protective capacity" for the Children. Mother alleged that Stepmother was abusive to and neglectful of the Children, including forcing V.H. to wear pull-ups to school when V.H. experienced gastrointestinal issues and bowel incontinence. She also alleged that Father and Stepmother violated the PPP by refusing to co-parent with Mother, specifically that they: 1) unilaterally denied Mother parenting time because of COVID-19; 2) failed to notify Mother within twenty-four hours of V.H. breaking her leg; 3) denied Mother access to medical and educational records, hampering Mother's ability to stay abreast of V.H.'s gastrointestinal issues; 4) refused to pay for their portion of the cost of transportation for the Children; and 5) did not provide Mother with unimpeded phone calls with the Children. Mother also averred, *inter alia*, that Father worked long hours that keep him away from the Children for most of the day, and that Stepmother had become the "de facto parent." According to Mother, the fact that Stepmother is the "de facto parent" violates the statutory mandate that both parents be allowed to "enjoy the maximum participation possible," insofar as the Children could be spending time with Mother instead. Tenn. Code Ann. § 36-6-106(a).

A three-day hearing was held on December 15 and 17, 2020, concluding on February 25, 2021. The juvenile court heard from several witnesses, including the parties, Stepmother, various family members of Father and Stepmother, G.T., and the Children's therapist in Chattanooga, Wayne Williams. The juvenile court also talked to the Children[2] *in camera* in front of the attorneys and the guardian ad litem, Kelli Black. In a detailed order entered April 14, 2021, the juvenile court determined that some changes had occurred since the entry of the PPP but that no material change in circumstances affecting the Children's well-being had occurred. In relevant part, the juvenile court explained:

> There have been several changes in circumstances since the prior Order but few that were not or could not have been anticipated: Mother entered into a relationship and plans to marry; both she and [F]ather had an additional child; the [C]hildren have aged; and both [M]other and [F]ather have moved to new residences. Beyond those changes, all of which either

---

[2] When trial commenced, V.H. was ten and P.H. was eleven. P.H. turned twelve before the final day of trial.

happen in the normal course of time or could have been anticipated, the situation is nearly the same. The parents still live over 2,000 miles apart; extended family is still local or at least not near Nevada; the [C]hildren are doing extremely well in [F]ather's care; and [M]other is still hostile toward the [S]tepmother and makes things much more difficult than they should be. The court finds that the changes that have occurred since the entry of the Order sought to be modified were reasonably anticipated when that Order was entered, do not affect the [C]hildren's well-being in a meaningful way and therefore are not sufficient changes in circumstances to change the primary residential parent. The Petitions therefore must be dismissed.

The juvenile court also found that the abuse allegations against Stepmother had not been proven. Out of an abundance of caution, the juvenile court also considered whether a change in primary residential parent was in the Children's best interests and, after application of the statutory best interest factors, determined that it was not. Mother appealed to this Court.

## ISSUES

Mother raises several issues on appeal. Because some of the issues are repetitive, we consolidate and restate them as follows:

1. Whether the evidence preponderates against several of the juvenile court's factual findings.

2. Whether the juvenile court erred in concluding that no material change in circumstances warranting a change in the primary residential parent has occurred.

3. Whether the juvenile court erred in concluding that making Mother primary residential parent would not be in the Children's best interests.

In his posture as appellee, Father asserts that he should be awarded his appellate attorney's fees.

## DISCUSSION

**Standard of Review**

This appeal involves modification of an existing permanent parenting plan. In *C.W.H.*, our Supreme Court reiterated "the *limited* scope of review to be employed by an appellate court in reviewing a trial court's factual determinations in matters involving child custody and parenting plan developments." 538 S.W.3d at 495 (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 692–93 (Tenn. 2013)). A trial court's factual findings are

- 6 -

reviewed "de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise." *Id.* Whether a material change in circumstances has occurred is a question of fact, as is whether a parenting plan is in the best interests of a child. *Id.* Accordingly, we "presume that a trial court's factual findings on these matters are correct and [will] not overturn them, unless the evidence preponderates against the trial court's findings." *Id.*

The juvenile court's decision will not be reversed absent an abuse of discretion. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing *Armbrister*, 414 S.W.3d at 693). An abuse of discretion occurs when a court "applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Id.* (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). A trial court abuses its discretion only when the ruling "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Id.* (quoting *Armbrister*, 414 S.W.3d at 693); *see also Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quotation omitted) ("[T]he details of custody and visitation with children are peculiarly within the broad discretion of the trial judge."). Under this stringent standard of review, we may not substitute our judgment for that of the juvenile court, and the ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Eldridge*, 42 S.W.3d at 85 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000)).

Finally, credibility determinations are of the utmost importance in cases involving custody and residential parenting schedules. *See Kelly*, 445 S.W.3d at 692; *see also Higdon v. Higdon*, No. M2019-02281-COA-R3-CV, 2020 WL 6336151, at *7 (Tenn. Ct. App. Oct. 29, 2020) (explaining that issues rested "upon a he said/she said dichotomy which, in turn, hinges upon an assessment of witness credibility"). As these cases are "factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Kelly*, 445 S.W.3d at 692 (citing *Armbrister*, 414 S.W.3d at 693). A lower court's credibility determinations will not be re-evaluated "'absent clear and convincing evidence to the contrary.'" *Id.* (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999)).

**Material change in circumstances[3]**

"After a permanent parenting plan has been incorporated into a final order or decree,

---

[3] Mother's first issue on appeal is that the record preponderates against several of the juvenile court's factual findings. The factual findings at issue primarily deal with the allegations of abuse and neglect against Stepmother and Father's purported interference in Mother's relationship with the Children. These factual issues are addressed in our discussion of whether a material change in circumstances has occurred.

- 7 -

the parties are required to comply with it unless and until it is modified as permitted by law." *C.W.H.*, 538 S.W.3d at 496 (citing *Armbrister*, 414 S.W.3d at 697; Tenn. Code Ann. § 36-6-405). Tennessee Code Annotated section 36-6-101 contains the standard for modifying a permanent parenting plan to designate a new primary residential parent:

> (B)(i) If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B)(i).

Modifications to a permanent parenting plan require a two-step analysis. The "threshold question is whether a material change in circumstances has occurred since entry of the trial court's previous order." *In re Jonathan S.*, No. M2021-00370-COA-R3-JV, 2022 WL 3695066, at *5 (Tenn. Ct. App. Aug. 26, 2022) (citing *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *4 (Tenn. Ct. App. Dec. 9, 2015)). Although there is no bright-line rule, whether a material change in circumstances has occurred involves several non-exhaustive factors: "(1) whether the change occurred after the entry of the order sought to be modified; (2) whether the change was not known or reasonably anticipated when the order was entered; and (3) whether the change is one that affects the child's well-being in a meaningful way." *McAdams v. McAdams*, No. E2019-02150-COA-R3-CV, 2020 WL 4723762, at *4 (Tenn. Ct. App. August 13, 2020) (citing *H.A.S. v. H.D.S.*, 414 S.W.3d 115, 123 (Tenn. Ct. App. 2013)).

If the petitioning party establishes a material change in circumstances, he or she must then demonstrate that the requested change is in the child's best interests. *Pippin v. Pippin*, 277 S.W.3d 398, 404 (Tenn. Ct. App. 2008). If the court determines that no change warranting modification has occurred, examining the child's best interests is not required. *McAdams*, 2020 WL 4723762, at *6.

Notably, the law regards a change in a parenting *schedule* differently than a change in the primary residential parent. As this Court has previously explained,

> Tennessee now has a different set of criteria for determining whether a material change of circumstance has occurred to justify a modification of a "residential parenting schedule" and the specifics of such a schedule. The amendment, specifically the addition of subsection [Tenn. Code Ann. 36-6-101](a)(2)(C), establishes different criteria and a lower threshold for

modification of a residential parenting schedule. *See Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2, n. 3 (Tenn. Ct. App. Aug. 18, 2006) (holding that Tenn. Code Ann. § 36-6-101(a)(2)(C) "sets a very low threshold for establishing a material change of circumstances"). However, the statutory criteria pertaining to a modification of "custody"-the term used in the statute, which we equate to the designation of "primary residential parent" and matters more substantive than a change of schedule-remain unchanged. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B).

*Scofield v. Scofield*, No. M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007). Consequently, "a different standard applies when a parent seeks modification of a residential schedule but not the designation of the primary residential parent." *McAdams*, 2020 WL 4723762, at *3 n.4. Stated differently, "Tennessee courts have required a higher measure of proof when the petitioner seeks a change in custody (*i.e.*, a change in the primary residential parent) than when he or she seeks only a change in the existing parenting schedule." *Tutor v. Tutor*, No. W2019-00544-COA-R3-CV, 2020 WL 1158075, at *2 (Tenn. Ct. App. Mar. 10, 2020); *see also Pippin*, 277 S.W.3d at 407 ("[B]ecause [f]ather's petition seeks a change of primary residential parent status, i.e., a change of 'custody,' we conclude that the lower threshold contained in Tenn. Code Ann. § 36-6-101(a)(2)(C) simply does not apply.").

In the present case, Mother sought to modify the juvenile court's custody determination and be named primary residential parent, meaning the "higher measure of proof" applied to her claim. *Tutor*, 2020 WL 1158075, at *2. On appeal, Mother argues that several factors amount to a material change in circumstances sufficient to warrant a change in custody and that the juvenile court erred in concluding otherwise. We address each of these contentions in turn.

### *Failure to adhere to the PPP*

Primarily, Mother claims that Father and Stepmother violate the PPP by refusing to cooperatively co-parent with Mother. *See* Tenn. Code Ann. § 36-1-101(a)(2)(B)(i) (providing that for purposes of custody modification, failures to adhere to a parenting plan may amount to a material change in circumstances). While Mother provides several examples to buttress this allegation, the juvenile court found that Mother's allegations were not proven and that "[M]other is still hostile toward the stepmother" and "makes things much more difficult than they should be." Having reviewed the record, we agree. The record does not preponderate against the juvenile court's finding that Mother failed to establish a material change in circumstances sufficient to change custody.

First, Mother argues that Father and Stepmother impede Mother's ability to send mail to the Children by intercepting the mail and even stealing it. In her principal brief, Mother claims that "there was extensive evidence that Mother does not have the ability to

send mail to the children and know that they will receive it without interference." This is not supported by the record. The primary proof on this allegation was the following testimony from Mother:

> Q. Okay. Have you in the past sent your children mail to their father's house?
>
> A. I have. I sent -- I sent gifts to them. I've sent head -- red headphones to [P.H.] that he claims that he didn't get. I sent some other gifts to them that they didn't receive until several weeks later. So I kind of changed the way that I've decided to send them stuff, like, I start with -- what ended up working out better for the kids and for me was just if it -- if I can include -- since [they're] in elementary school at the time -- if I can include something special for their class and for them on a holiday, then it works.

Mother then stated that she now sends gifts and snacks for the Children to their school. The Children also testified that Mother sends them mail and clothing. V.H. testified that, sometimes, she and C.H. have to share clothing and that V.H. would prefer to not have to do this.

We disagree with Mother's characterization that this amounts to extensive testimony that Father and Stepmother steal the Children's mail. Moreover, it is undisputed that when Mother revealed to the Children that she was expecting in the spring of 2020, she mailed the Children a package with a card and some sort of announcement. Stepmother testified that they expected the package ahead of time and that they opened it with the Children, and the Children were excited. Mother never disputed this. Accordingly, the record does not establish that Mother lacks the ability to send mail to the Children.

Mother also claims that Father and Stepmother deprive her of unimpeded phone calls with the Children and are slow to update Mother with news of the Children. One incident that caused significant controversy was when V.H., the younger child, broke her leg in January of 2020. Mother argues that she did not receive notice of the injury within twenty-four hours and that Father did not notify Mother until several days after the injury occurred. Both Father and Stepmother confirmed that V.H. broke her leg in January of 2020 and explained that it happened on a Saturday afternoon at a skating birthday party for P.H. Stepmother testified that V.H. fell and that they applied ice and a wrap.[4] V.H. elevated her foot and appeared fine that evening. The next day, however, Stepmother noticed that the leg looked worse and was bruised. Stepmother testified that she had her sister, who is a nurse practitioner, look at the leg. After the sister recommended an x-ray, Stepmother took V.H. to a walk-in clinic where it was determined that the leg was

---

[4] Mother testified at trial that she heard from undisclosed "third parties" that V.H.'s injury did not occur in the manner claimed by Father and Stepmother. No other witnesses were called to testify by Mother, however, other than herself and G.T.

fractured.  According to Stepmother, she and V.H. returned home late Sunday afternoon and called Mother shortly thereafter.[5]  Stepmother helped V.H. call using a Google phone because Mother has Stepmother's number blocked and Father was not home.

The record does not support Mother's characterization of this event, primarily because Mother never disputed that the fall occurred on a Saturday, and Mother then testified that she heard about the injury the very next day, Sunday.  While Mother claims that she did not receive notice of the injury for several days, her own testimony belies that claim.  Moreover, Father was working when Stepmother discovered the bruising and decided to take V.H. to the clinic.  It is undisputed that Mother has Stepmother's number blocked in Mother's phone.  Accordingly, under these particular circumstances, the slight delay in contacting Mother is partly Mother's fault, insofar as she refuses all contact with Stepmother.  As the juvenile court aptly noted, "[t]he timing of reporting [V.H.'s] injury to [M]other could have been better but was not unreasonable given the timing and communication constraints."

Mother also claims that she is not provided with unimpeded phone calls with the Children and that Stepmother eavesdrops on the calls.  The primary basis for this argument is the testimony of the Children, and Mother argues in her brief that the Children "are only permitted to speak to Mother approximately once or twice per month, and that these conversations are always monitored."  The testimony to which Mother is referring went as follows:

THE COURT: So your mom usually calls at least once a week?

P.H.: Yeah.

THE COURT: Okay. And how does that go? How do those conversations go?

P.H.: Well, we haven't talked for like a month, so –

V.H.: She call [inaudible][6]

THE COURT: Why have you not talked for a month?

P.H.: She just never calls. And then like, I don't know if she's doing something or not because she never

---

[5] Father was working when Stepmother decided to take V.H. to the clinic.

[6] This excerpt reflects a significant problem with the Children's testimony.  V.H. and P.H. were examined at the same time by the juvenile court; throughout the testimony, the Children talk over and interrupt one another.  This renders the testimony generally difficult to follow.

V.H.: Whenever I call, she usually answers unless she's in the shower. Then she doesn't answer.

THE COURT: Okay. But you call her sometimes?

V.H.: Yeah. She called me last night driving home. [Mother's baby] was fussy. The baby was fussing.

Regarding Stepmother listening to their phone calls, P.H. testified as follows:

P.H.: But [Stepmother] kind of listens to everything because whenever I was talking to my mom -- or whatever. Like not [inaudible], I could hear her by the door upstairs while I was downstairs in the basement. Or I was talking to her, and then I'd hear my mom, like, [Stepmother], I'd hear her in the background. And then -- like not in the background, but I'd hear her on the stairs, and I'd see her shadow. And then I'm just like okay. Let's not talk about anything serious because she's right there.

THE COURT: Okay.

Stepmother did not necessarily dispute this testimony. Rather, she confirmed that sometimes it is difficult not to overhear the Children's phone calls because she helps them with the calls and is sometimes doing things around the house during the calls. P.H. in particular likes to use the phone in the kitchen. Stepmother also testified that they try to limit the Children's phone usage but that they are always free to call or text Mother. *See McAdams*, 2020 WL 4723762, at *5 (explaining that as the custodial parent, the mother was free to take the child's cell phone away under certain circumstances so long as the sole purpose was not to interfere with the father's access to the child). V.H. testified that she and Mother text frequently. Stepmother denied intentionally eavesdropping on the Children.

P.H.'s testimony that he, unfortunately, is not always comfortable talking in front of Stepmother is not the same as Mother being intentionally deprived of communication with the Children. Indeed, both Children indicated at multiple points during their testimony that they are free to call Mother whenever they wish. V.H. testified that she and Mother are in contact all the time through text messages. Ultimately, the juvenile court concluded that "[b]oth children have phones and access to their mother[,]" and the record does not preponderate against this finding.

Next, Mother claims that Father and Stepmother violated the PPP by failing to provide Mother with records for the Children, including medical records and educational records. While Mother claimed at trial that she has been unsuccessful in requesting such

records from the Children's providers and their school, her testimony was vague. In addressing school records, Mother testified as follows:

Q. And what about -- now, as far as their schools and your ability to communicate with them, how would you describe that?

A. I don't feel -- I feel like because the children were so young and in elementary school, it was really easy for me to make connections, but now that they've kind of gotten a little bit older, when you transition into school like that and you're not the primary parent, you don't make any decisions, you're not involved in any of that, the school basically told me that, hey, I have no decision-making. So I don't get to sign papers. I don't get all the information.

Mother's testimony about trying to obtain medical records was similarly vague:

Q. Okay. You indicated that you were unable to get information from medical providers and that's -- you said -- because you weren't the -- you didn't have decision-making, you couldn't get the information from medical providers. Did you take the position that some law provides that if you're not the decision-making parent, you don't have access to medical records? Do you have any authority for that proposition?

A. I received feedback from medical providers and I've worked in the medical field and I've also helped people obtain power of attorneys, and when you don't have that decision-making, you have no authority. It's up to the parent to put you down as a person they can release information to.

Mother later stated, "like I have argued with some medical providers before, I've showed that document to medical providers before, and I don't get much of anywhere." Aside from her own vague testimony, Mother presented no proof regarding specific instances in which she sought records from a particular provider and was denied access. Further, Mother testified about being in contact, without issue, with V.H.'s teachers to discuss V.H.'s individualized education plan ("IEP") and her reading. Stepmother testified that the Children's grades are available through an application called "PowerSchool" and that any parent can make an account and log in. Mother did not testify about whether she has attempted to use this application.

Father also presented into evidence a printout of his account on a software application called "Our Family Wizard," which the parties sometimes use to communicate. Use of this program was ordered by the Nevada court, and Father uses it to upload documents such as medical records and bills, school schedules and calendars, and the Children's art. This exhibit establishes that Father regularly keeps Mother apprised of

when the Children visit the doctor, take certain medications, etc. Based on all of the foregoing, including Mother's vague testimony, it is unclear what other sorts of records Mother is seeking. It is unsurprising that Mother has had some difficulty communicating with medical providers given that she lives out of state; however, Mother did not establish that Father and Stepmother intentionally impede Mother's ability to get information on the Children. The record preponderates in favor of the juvenile court's finding that Mother did not prove this allegation.

Finally, Mother claims that Father and Stepmother violate the PPP by refusing to cover their share of the Children's transportation costs when the Children return from Nevada. This argument stems from a disagreement between Mother and Father over language in a previous court order on how to split transportation costs. Mother's testimony on this topic was that "[t]he way that the order read, my understanding and my perspective was it was the receiving parent." Father seemed to take the position that he was responsible for return transportation costs during the summer, but not all the time. Mother's argument that this amounts to a violation of the PPP is challenging for multiple reasons.

First, the record does not contain the order over which the parties disagree. Mother's petition to modify provides that "[o]n April 15, 2018, the court issued an order stating that the 'parties were in agreement for the receiving party to bear the costs of transportation for the visitation. The Parties will follow the children's school calendars for summer visitation with the Mother." Without the full context and language of the order from which this disagreement arises, it is difficult to discern which party's interpretation is reasonable or correct.

Second, Mother claims in her brief that "[f]all break 2019 was one such example, where Father refused to cover the cost of transporting the children, despite it being his obligation under the plan." While the record establishes that a dispute occurred over fall break of 2019, the full details of what transpired are unclear. Father testified that Mother flew into Tennessee at the last minute over fall break of 2019 without discussing it with him and disrupted his plans to take the Children to the beach. Mother testified that she did fly into Tennessee over the break but then opted to take the Children back to Nevada with her. Regarding the transportation costs, Mother testified:

A. So initially, [Father] says no, the – it's my understanding from what he told me was that he was only responsible to cover the cost for the children's return upon summer, but not any other time. And --

Q. That's what [Father] tells you?

A. Yes. And at some point later on, it came down to, "Well, we bought" -- he kind of – I don't even want to say changed his perspective, but he kind of was like, "Well, we got the tickets for them to return, but we're going to turn

- 14 -

around and cancel them if you don't respond to us within a specific time frame," which wasn't a communication with him. It was communication with – that's what [Stepmother] told my attorney, but I was in the middle of flying back from Sacramento and I couldn't respond. I couldn't say anything. So they have that you can book your flight within 24 hours, if you cancel it within 24 hours, you don't get charged. So they canceled it and then I end up having to pay for it anyway. So if it's anything other than summer, I'm usually paying for that return flight.

As with most of the issues in this case, it is difficult to discern what actually transpired over fall break of 2019 because Mother and Father both have an entirely different version of the events. Under the circumstances, we cannot conclude that this example establishes a violation of the PPP by Father. At most, it highlights the extreme difficulty these parties have with communication, which is not a change in circumstances, and buttresses the juvenile court's finding that "too much communication goes through the [C]hildren."

### *Stepmother's treatment of the Children*

Mother's next contention on appeal is that Stepmother is neglectful and abusive to the Children. Mother argues that Stepmother favors C.H. over the Children, that Mother inflicts harsh punishment on the Children, and that Father is aware of Stepmother's actions and fails to protect the Children. The juvenile court, having heard testimony on this issue from the Children, Mother, Father, and Stepmother, concluded that "[t]he allegations that [S]tepmother is overly stern, harsh, or harmful to the [C]hildren were not proven."

The juvenile court had the "opportunity to observe the witnesses and make credibility determinations," and was "better positioned to evaluate the facts" than this Court is. *Kelly*, 445 S.W.3d at 692 (citing *Armbrister*, 414 S.W.3d at 693). Any credibility determinations made by the juvenile court are entitled to great weight on appeal, and will not be re-evaluated by this Court absent clear and convincing evidence otherwise. *See id.* Because the juvenile court's findings about abuse and neglect in Father's home are implicit credibility findings, and because the record does not contain clear and convincing evidence otherwise, we leave these findings undisturbed.

Mother's petition and her appellate brief discuss several instances which Mother avers amount to neglect or even abuse by Stepmother. The problem faced by this Court with regard to each of these instances is that Mother, Father and Stepmother, and the Children each tell a different version. One such example is the incident involving V.H.'s gastrointestinal issues and V.H. wearing pull-ups to school. It is undisputed that at some point in 2018 or 2019, V.H. began having stomach issues and bowel incontinence and would sometimes have accidents at school. Mother claimed in her petition that Stepmother punished V.H. by forcing her to wear pull-ups to school, clean out the pull-ups by hand, and by smearing feces on V.H.'s face. Stepmother, on the other hand, testified that V.H.

wore pull-ups to school for a short period of time to address the acute embarrassment of having accidents. Stepmother testified:

Q. Okay. At some period of time did you send [V.H.] to school with like a pull-up diaper-type of device on or anything like that?

A. Yeah. So -- yeah. This was affecting, you know, [V.H.] kind of mentally. Not the pull-up part. She's trying to figure out how she can keep feces from falling in the floor while she's at school, so her idea was if I wear a pull-up, they won't see it in the floor. And I, you know, my -- well, it's hearsay, so I'm not even going to say that, but she asked to do it and I was really against it. Every time we'd go to the grocery store she would see the pull-ups and say something and, you know, she really hinted that she wanted to. Finally, I broke in. She -- when I first gave them to her, she was, you know – she was going through them, and I actually took them away, you know. I was like, you know, I need to know when there's an issue, and I took them away from her.

Q. Okay. Because she was just starting to use them regularly?

A. Yes. And I felt like the issue just wasn't getting better. I felt like if she knew she had a pull-up on, she didn't have to, you know, address the issue.

Q. Okay. And about how long did she have them before you took them away?

A. You know, it was not long.
Regarding having cleaned out the pull-ups by hand, Stepmother testified:
Q. Okay. At some time did you have [V.H.] clean a diaper out or rinse a diaper out, clean a diaper out that actually had feces on it?

A. No. Well, we did underwear. I know we did underwear and that was me just kind of showing her how to do it in case she was out, you know, at someone's house and she didn't have a change of clothes, she needed to know how to take care of herself. But I don't recall of a pull-up doing that.

Finally, Stepmother outright denied smearing feces on V.H.:

Q. Okay. Have you ever smeared feces on [V.H.'s] face?

A. No. And when I read that, it really bothered me hearing that because I have worked with [V.H.] so much on this issue, and that does not happen. It has never happened.

- 16 -

The juvenile court also asked the Children about V.H.'s incontinence; however, it was primarily P.H. who answered:

> THE COURT: So this might be a little bit difficult, but have there been any like bathroom-type accidents or anything?
>
> V.H.: Not a lot now.
>
> THE COURT: Okay. Those in the past?
>
> V.H.: Yeah.
>
> THE COURT: And how long ago?
>
> V.H.: I don't know.
>
> THE COURT: Long time?
>
> P.H.: I know.
>
> V.H.: [P.H.] knows. I don't.
>
> THE COURT: What do you know about that?
>
> P.H.: Well, it's because I hear [Stepmother] yelling at her. And she's just like, "Why don't you tell me?" And [V.H.] is like, "I do tell you." And then she's like, "No, you don't." And then she just, like -- she gets mad, and then, like, she always says, "You're going to wear diapers now," and stuff.
>
> THE COURT: Wear diapers?
>
> P.H.: Yeah.
>
> THE COURT: Did you ever wear the diaper --
>
> V.H.: Yeah.
>
> THE COURT: -- since you've been – since you've been --
>
> V.H.: Not --
>
> P.H.: Her teachers made her take it off

THE COURT: Not this year?

P.H.: Not this year, but last year.

THE COURT: But last year?

P.H.: Yeah.

THE COURT: Like a pull-up?

P.H.: Basically.

THE COURT: Did you need it?

V.H.: No.

P.H.: Her teachers made her take it off in third grade. She's had it for like two years.

THE COURT: Okay. So [V.H.], do you feel like you needed the pull-up?

V.H.: No. [inaudible] because I did have a lot of accidents, and I didn't want to wear them because they're small, and if I pull them back up [inaudible] and I have to wear them.

The foregoing testimony highlights the "he said/she said dichotomy" permeating this case. *Higdon v. Higdon*, No. M2019-02281-COA-R3-CV, 2020 WL 6336151, at \*7 (Tenn. Ct. App. Oct. 29, 2020). Ultimately, however, the juvenile court concluded that the above and other allegations against Father and Stepmother were not substantiated.[7] In this sense, the juvenile court credited Stepmother's testimony over that of the Children. *See Manning v. Manning*, 474 S.W.3d 252, 262 (Tenn. Ct. App. 2015) (noting that "in some cases, we may assume that the trial court found one party more credible than another due to the trial court's decision"); *Kerst v. Upper Cumberland Rental and Sales, LLC*, No. M2014-00894-COA-R3-CV, 2015 WL 1416171, at \*3 (Tenn. Ct. App. Mar. 25, 2015) (deferring to the trial court's "implicit" credibility findings, and noting that same would not be overturned absent clear and convincing evidence to the contrary). While Mother

---

[7] Another example of an allegation against Father and Stepmother is that the Children consistently get lice and are not treated. Mother testified that the Children frequently arrive at her home in Nevada with lice, while Stepmother maintained that the Children frequently return from Nevada with lice. While Mother attributed this to Stepmother's neglect, Stepmother testified that the Children may be getting lice from their frequent airplane travel. The lice issue is yet another example of how the parties involved have diametrically opposed testimony about the Children, and why this Court must necessarily rely on the credibility determinations of the juvenile court.

argues in her brief that the juvenile court failed to appropriately credit the Children's testimony, the juvenile court was well within its discretion in doing so. This Court has previously explained that in cases such as this one, where the issues rest "upon a he said/she said dichotomy[,]" the case "in turn [] hinges upon an assessment of witness credibility." *Higdon*, 2020 WL 6336151, at *7.

The record does not contain clear and convincing evidence establishing that the juvenile court's implicit credibility findings should be re-evaluated. The juvenile court was faced with differing testimony on nearly every issue before it, including the purported abuse and neglect by Stepmother, and reached its decision based on its observations of the parties. *See Kelly*, 445 S.W.3d at 692 ("Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges."). We will not second guess this decision. *See C.W.H*, 538 S.W.3d at 495 (noting the "limited" scope of an appellate court's review of a trial court's factual determinations in matters involving child custody). Accordingly, we agree with the juvenile court's conclusion that Mother did not establish a material change in circumstances due to abuse and/or neglect in Father's home.

### *"De facto" parenting*

Mother's remaining arguments regarding a material change in circumstances are that Stepmother has become the "de facto" parent in Father's house and that P.H. expressed a preference to live with Mother in Nevada. Like the juvenile court, we are unpersuaded by both of these arguments.

Mother argues that because Stepmother stays home while Father works, Stepmother has become the "de facto" parent in the home. Mother claims that "when a third-party without custody of a child is performing most of the parenting duties, courts should not diminish time of a more available parent in favor of the parent delegating his duties to the third-party." Nonetheless, Mother's testimony at trial did not establish that she is substantially more available to parent the Children than Father is. Father testified that he works five days a week, typically from 7:00 a.m. to 5:00 p.m. Occasionally, he works late. Father has one day off during the week, as well as Saturdays off. When Father is off during the week, he does parenting duties such as dropping the Children off at school and picking them up. Mother also works full-time. She testified that her schedule is typically Monday through Friday from approximately 6:00 a.m. to 3:00 p.m. Mother testified that if the Children were to live with her in Nevada, they would get on the bus to school at 6:50 a.m. and probably go to swim club after school. Consequently, the record does not show that Mother is more available to parent the Children than Father is. Further, both Father and Stepmother testified that they are co-parents who work together to parent the Children. As has been discussed at length already, the juvenile court clearly credited this testimony.

- 19 -

Moreover, the cases cited by Mother on this point are distinguishable from the case at bar. For example, Mother cites *Roland v. Roland*, No. M2014-02032-COA-R3-CV, 2015 WL 5719833 (Tenn. Ct. App. Sept. 29, 2015), for the proposition that the juvenile court's ruling does not "comply with the statutory directive that courts are to 'order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child[.]'" *See* Tenn. Code Ann. § 36-6-106(a). In *Roland*, the father was a firefighter and worked twenty-four-hour shifts, followed by forty-eight hours off. *Id.* at *1. The father planned to have his mother care for the children on the days he worked. *Id.* The mother planned to work for her father's company and had significant flexibility in her schedule. *Id.* at *2. The trial court ordered that "[t]he [f]ather shall have the children during his forty-eight (48) hours off from work and the [m]other shall have the children while the [f]ather is working his twenty-four (24) hour shift." *Id.* at *5.

The mother challenged this parenting schedule on appeal, and this Court reversed. However, that decision was based primarily on the fact that "the residential schedule is unorthodox and problematic because it is based entirely on [f]ather's work schedule and has no regularity to it." *Id.* at *9. Further, the trial court's decision "basically relegate[d] [m]other to the position of 'babysitter' for the children while [f]ather is working and gives her very little meaningful opportunity to parent her children, even as an alternate residential parent." *Id.* at *10.

*Roland* is distinguishable. Father and Mother both work five days a week and have substantially similar time to spend with the Children. Both necessarily rely on their partners to help co-parent and have other children to look after. Both Mother and Father testified to having some flexibility with their schedules. While Father testified that he occasionally works in the evenings, this is true for most working parents. Even if we were to consider Father's work schedule atypical or unorthodox, which we do not, "the fact that the custodial parent has an atypical work schedule, in and of itself, should not necessitate a change in the designation of primary residential parent, if the other factors do not weigh in favor of such a change." *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *27 (Tenn. Ct. App. July 14, 2011).

### *P.H.'s preference*

Finally, Mother claims that P.H. expressed a preference to live with her in Nevada and that the juvenile court did not appropriately credit this testimony. Mother also argues that the juvenile court did not appropriately credit the GAL's statements to the juvenile court that P.H. confided in her his desire to live in Nevada full-time.[8] As we have already

---

[8] Father argues on appeal that it was inappropriate for the GAL to have made such statements to the juvenile court and that the GAL should have instead called P.H. as a witness. However, Father's counsel did not object when the GAL made these statements to the juvenile court. Father therefore never raised this issue at trial, and it is "axiomatic that parties will not be permitted to raise issues on appeal that they did not first raise in the trial court." *Powell v. Cmty. Health Sys., Inc.*, 312 S.W.3d 496, 511 (Tenn. 2010)

addressed at length, however, the juvenile court was well within its discretion to evaluate the parties' and witness's demeanor and credit the testimony accordingly. Moreover, although Mother characterizes P.H.'s testimony on this issue as unambiguous, the record does not support this characterization. Rather, the Children's testimony on this topic was equivocal:

> THE COURT: All right. Where do you think you should live most of the time?
>
> P.H.: Okay. That's a really hard question.
>
> THE COURT: Yeah. That's a hard question. You asked for it.
>
> P.H.: I don't really know. If you count that 90 days times 11, that would probably be 890 -- that would be like about -- almost a thousand days. And then count the 200-something and then --
>
> V.H.: [inaudible]
>
> THE COURT: He's calculating days and 11 years. I see where you're going.
>
> P.H.: If you count like the 200 days, that would probably be like triple that, so that would be like 3,000 days.
>
> THE COURT: Yeah.
>
> P.H.: Two thousand [inaudible]. Like around that, and then --
>
> THE COURT: Well, but because of the distance, you know, it's so far, you know. You'd like to be able to say, "Well, half my time here and half my time here"
>
> P.H.: That's right.
>
> THE COURT: -- but that's not very --
>
> P.H.: I always thought that six months there, six months there, six months there.

---

(citing *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006)); *see also Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) ("Objections to the introduction of evidence must be timely and specific.").

THE COURT: -- not very practical because you want [inaudible] same school for the whole year. And so –

P.H.: [inaudible] change?

V.H.: You change. And [inaudible] and it's like changing sixth grade [inaudible]

P.H.: Technically you don't go to school so –

THE COURT: Yeah.
 *     *     *
THE COURT: Okay. So you want to answer the first question?

P.H.: What's that one?

THE COURT: The one that you haven't answered.

P.H.: Oh, that. Well, like

THE COURT: [inaudible] What are you thinking?

V.H.: [inaudible] question.

P.H.: If I had to choose, it might be my mom, like, because it's always -- like, she never sees me. My dad, I see him a lot. I see him every day. [inaudible] not even every day. If I had to choose, then my mom, but it might be my dad because I don't want to hurt any feelings.

THE COURT: Yeah.

P.H.: So I don't want to choose, but it would probably be my mom because she always tries her hardest to do anything.

Understandably, P.H. expressed that he would like to spend more time with his Mother, inasmuch as he does not see her as often as he sees Father. Nonetheless, the overall tenor of P.H.'s testimony was that he would prefer not to choose and would prefer to spend half of his time with Father and half of his time with Mother. P.H.'s feelings are natural given the great distance between him and Mother.

We have already determined that Mother has not otherwise established a material change in circumstances, and a child's preference alone does not constitute a material change. *See Pippin*, 277 S.W.3d at 405–06. Accordingly, even if P.H.'s testimony was as

clear as Mother claims it is, we discern no error in the juvenile court's decision that P.H.'s preference is not a material change in circumstances sufficient to alter custody. *Id.*

While some facets of the Children's lives have changed since the entry of the last PPP, Mother did not establish that any of these changes affected the Children in a meaningful way. Indeed, Father called several witnesses at trial who testified that the Children are great kids who seem to be happy, healthy, and thriving. The juvenile court made the same observation after speaking with the Children. Mother called no witnesses aside from herself and G.T., despite the fact that her family still resides in Tennessee and have relationships with the Children. And contrary to Mother's claims, the Children's grades suggest they are doing well in school, and V.H.'s health issues have improved.

We "are generally reluctant to change initial custody determinations unless it is clear that modification is necessary." *Canada v. Canada*, No. W2014-02005-COA-R3-CV, 2015 WL 5178839, at *4 (Tenn. Ct. App. Sept. 4, 2015); *see also Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006) ("Because children are more likely to thrive in a stable environment, the courts favor existing custody arrangements."). Bearing these principles in mind, as well as the presumption that the juvenile court's factual findings are correct and the higher measure of proof faced by Mother, we agree that none of the circumstances on which Mother relies constitute a material change in circumstances sufficient to modify the primary residential parent. Because Mother failed to establish a material change in circumstances, we need not examine whether a change in primary residential parent would be in the Children's best interests. *See McAdams*, 2020 WL 4723762, at *6; *Pippin*, 277 S.W.3d at 405.

### Attorney's fees

Father requests his appellate attorney's fees. Mother argues in her reply brief that Father's argument as to fees is skeletal and that his argument is thus waived. Nonetheless, Father appropriately raises his appellate fees in his statement of the issues and cites Tennessee Code Annotated section 36-5-103 as authority for his request.[9] In any event, whether to award appellate attorney's fees pursuant to section 36-5-103(c) lies within this Court's discretion. *Strickland v. Strickland*, 644 S.W.3d 620, 635–36 (Tenn. Ct. App.

---

[9] This statute provides in relevant part:

(c) A prevailing party may recover reasonable attorney's fees, which may be fixed and allowed in the court's discretion, from the nonprevailing party in any criminal or civil contempt action or other proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order, or in any suit or action concerning the adjudication of the custody or change of custody of any children, both upon the original divorce hearing and at any subsequent hearing.

Tenn. Code Ann. § 36-5-103(c).

2021). Here, Mother has not prevailed on any issue. Under the circumstances, we deem it appropriate to award Father his reasonable attorney's fees incurred in defending Mother's appeal.

## CONCLUSION

The ruling of the Juvenile Court for Hamilton County is affirmed, and the matter is remanded for a determination of Father's reasonable attorney fees incurred on appeal in accordance with this opinion. Costs of this appeal are assessed to the appellant, L.A.S.

_____
KRISTI M. DAVIS, JUDGE